IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Benjamin Hendricks,                  :

       Plaintiff,               :

    v.                               :   Case No. 2:11-cv-40

Ohio Department of                   :   JUDGE MICHAEL H. WATSON
Rehabilitation and Correction,           Magistrate Judge Kemp
et al.,                              :

       Defendants.              :

<u>REPORT AND RECOMMENDATION</u>

Plaintiff, Benjamin Hendricks, a state prisoner, filed this action under 42 U.S.C. §1983 alleging that by denying him a restricted diet as ordered by medical specialists, defendants John DesMarais, Mona Parks, Theresa Bell, and Susan Nesbitt have demonstrated deliberate indifference to his serious medical needs.  Mr. Hendricks also alleges that Michelle Miller, Warden at the Belmont Correctional Institution, violated his First Amendment rights when she destroyed his legal materials in retaliation for his having filed grievances regarding his medical care.  Currently before the Court is the defendants' motion for summary judgment.  The motion has been fully briefed.  For the following reasons, the Court will recommend that the motion for summary judgment be granted.

I.  <u>Legal Standard</u>

Summary judgment is not a substitute for a trial when facts material to the Court's ultimate resolution of the case are in dispute.  It may be rendered only when appropriate evidentiary materials, as described in Fed. R. Civ. P. 56(c), demonstrate the absence of a material factual dispute and the moving party is entitled to judgment as a matter of law.

Poller v. Columbia Broadcasting Systems, Inc., 368 U.S. 464
(1962).  The moving party bears the burden of demonstrating
that no material facts are in dispute, and the evidence
submitted must be viewed in the light most favorable to the
nonmoving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144
(1970).  Additionally, the Court must draw all reasonable
inferences from that evidence in favor of the nonmoving
party.  United States v. Diebold, Inc., 369 U.S. 654 (1962).
The nonmoving party does have the burden, however, after
completion of sufficient discovery, to submit evidence in
support of any material element of a claim or defense on
which that party would bear the burden of proof at trial,
even if the moving party has not submitted evidence to negate
the existence of that material fact.  See Celotex Corp. v.
Catrett, 477 U.S. 317 (1986); Anderson v. Liberty Lobby,
Inc., 477 U.S. 242 (1986).  Of course, since "a party seeking
summary judgment ... bears the initial responsibility of
informing the district court of the basis for its motion, and
identifying those portions of [the record] which it believes
demonstrate the absence of a genuine issue of material fact,"
Celotex, 477 U.S. at 323, the responding party is only required
to respond to those issues clearly identified by the moving party
as being subject to the motion.  It is with these standards in
mind that the instant motion must be decided.

## II.  Factual Background

     At the outset, the Court notes that the verified revised
amended complaint is not entirely specific regarding the time
frame relevant to Mr. Hendricks' Eighth Amendment claim.  In his
response to the motion for summary judgment, Mr. Hendricks
clarifies that his claim is directed only to events occurring
between February 20, 2009 and November, 2009 while he was
incarcerated at the Belmont Correctional Institution.  See

-2-

Plaintiff's Response (Doc. #102), p. 24.  As a result, the Court will limit its discussion of the medical records and other factual material presented to this time period other than as needed to provide background information.  Almost all of the evidentiary material submitted for the Court's review is addressed to Mr. Hendricks' Eighth Amendment claim.  The following facts, construed in the light most favorable to Mr. Hendricks, are taken from the verified revised amended complaint and Mr. Hendricks' declaration in support of his memorandum contra the motion for summary judgment with attached exhibits.

A.  <u>Eighth Amendment Claim</u>

Dr. DesMarais was the medical director for the Ohio Department of Rehabilitation and Correction during Mr. Hendricks' incarceration at Belmont.  Revised Amended Complaint ¶11.  Ms. Parks was an assistant chief inspector (medical) for the ODRC during this time.  <u>Id</u>. at ¶12.  Ms. Bell was the dietary operations manager for the ODRC and Ms. Nesbitt was the health care administrator at Belmont.  <u>Id</u>. at ¶¶13, 14.

Prior to his incarceration, Mr. Hendricks was diagnosed with ulcerative colitis and had his colon removed.  Hendricks' Declaration, ¶3, ¶5.  Upon his incarceration, he was hospitalized at the Ohio State University Medical Center.  <u>Id</u>. at ¶8.  He was discharged from OSU on October 23, 2008, with orders to the Corrections Medical Center that he be given a "Regular/Lo Residue" diet.  <u>Id</u>. at ¶11.  On December 24, 2008, he was transferred to the Belmont Correctional Institution.  <u>Id</u>. at ¶13.  Shortly after his arrival at Belmont, Mr. Hendricks met with a dietetic technician who attempted to address his dietary needs.  <u>Id</u>. at ¶14.  Because food service was having difficulty understanding the diet, Mr. Hendricks had a conversation with the inspector of institutional services on February 19, 2009.  <u>Id</u>. at ¶15.  The inspector obtained a copy of Mr. Hendricks' diet card

-3-

and contacted Ms. Nesbitt.  Id. at ¶16. On February 20, 2009, Ms. Nesbitt confiscated Mr. Hendricks' diet card.  Id. at ¶17.  On February 25 and 27, 2009, Mr. Hendricks met again with the diet technician.  Id. at ¶¶19, 21.

Mr. Hendricks did not believe his meeting on February 27 resolved his diet issue and he initiated the grievance process later that day.  Hendricks Declaration, ¶23, PAGEID# 855. In his informal complaint, he stated:

> On 2/19/09 I had a conversation with Ms. Riley about my special diet.  She took a photo copy of my diet card and contacted Ms. Nesbitt HCA.  ON 2/20/09 Ms. Nesbitt took my diet card because the doctor did not prescribe the diet.  Ms. Nesbitt then consulted my chart from O.S.U. Hospital and found the diet prescription.  On 2/25/09 I saw the diet technician who found out that the diet I was to be on was what she had on the original diet that Ms. Nesbitt took.  On 2/27/09 I saw the diet technician who said that per DRC and Belmont policy that my diet didn't have to be followed.  . . .

Id.

Mr. Hendricks received a response to this complaint on March 10, 2009, which stated, in part, "you are receiving the appropriate diet and diet education from medical."  PAGEID # 855. Mr. Hendricks prepared a notification of grievance on March 13, 2009, stating:

> I have been having problems with dietary issues since day 1.  It clearly states in my chart from OSU Hospital that I am to be on a low residue diet.  Also anybody who knows anything about Crohns Disease knows there are certain foods that cause irritation and pain. Also because of the loss of my entire colon I should be taking some kind of dietary supplement.  Under the Fussell agreement section JJ under diets it states that all institutions must provide medically required diets.

PAGEID #856.

Mr. Hendricks received a disposition of grievance dated March 27, 2009, signed by Kelly S. Riehle which stated:

-4-

Your grievance, filed on 03/17/2009, has been reviewed and disposed of follows:

The office of Inspector is in receipt of your complaint in which you state that you are having problems with your diet and that you are to be on a low residue diet. To investigate your complaint, I reviewed your medical file and spoke to Ms. Nesbitt, HCA.
Per your medical file, OSU notes, there is no evidence that you have Crohn's Disease.  Your colon was removed prior to incarceration so there is nothing in your current medical file to indicate why the surgery was performed.  You give conflicting stories of why to various BeCI staff, telling medical it's Crohn's but telling other staff you were shot in Iraq.  BeCI medical has sent for you (sic) medical records.  Once they obtain them they will be reviewed to see if there is any record or medical evidence of Crohns' (sic) disease.  If there is, it will be addressed.  Regarding your diet, because you do have a colostomy bag you are being afforded a special diet.  You are to receive 6 small meals a day.  You have been educated on what food you are to stay away from.  If a food that you are not to eat is on the menu you are given a substitute for that item.
Per your medical records you have gained weight since you entered the system so apparently your nutritional needs are being met.  There is nothing in your medical chart to indicate you need a dietary supplement.
It is my finding that there is insufficient evidence to support your claim.
This office will take no further action on this matter at this time.

PAGEID #857.

On April 5, 2009, Mr. Hendricks filed an appeal to the Chief Inspector which stated:

Ms. Riehle is incorrect in her review of my medical records.  Crohn's Disease is well documented and surgery is needed, per OSU, from this problem.  Ms. Riehle is correct that my colon was removed prior to my incarceration but it is well documented as to why - Crohn's disease.  Again if BECI had sent for my records 3 months ago the level of care I'm receiving wouldn't be an issue.

> As for the special diet.  I am receiving 3 regular
> trays a day (1,000 calorie) like everybody else plus 3
> so called small meals consisting of: 1 piece of cheese,
> 1 piece of stale bread, 1 apple/orange.  This is the
> same thing every day.  This does not constitute 6 small
> meals.
> Ms. Riehle is correct that I am being adjusted but only
> from recent info sent to me from Crohn's and Colitis
> Foundation of America and not from IHS.  This is
> basically the problem.  Every time I raise the issue of
> what I have learned I'm told either I'm lying or I
> don't have Crohns or something else.
> The only substitution of the food is the main course
> which is substituted with other food I still have
> trouble eating.
> ...

PAGEID #858.  The chief inspector responded on April 22, 2009,
concluding that Mr. Hendricks was being afforded proper care
under ODRC guidelines and affirming the inspector.  PAGE ID
##859-860.

On April 23, 2009, Mr. Hendricks was seen at the East Ohio
Regional Hospital for abdominal pain.  Hendricks' Declaration,
¶26.  The emergency trauma record contains the following
information:

> This is a 32-year-old presents to the emergency
> department complaining of right-sided abdominal pain.
> He has a history of Crohn's.  Has a colostomy on the
> right.  He states he gets flare-ups like this before
> when he gets constipated and obstructed.  He is not
> vomiting.  No nausea at this time.  Just the right-side
> cramping pain.  He states he really has had much out of
> his colostomy.  He states usually will need some
> Toradol for pain and magnesium citrate.  It is mainly
> because he states they are not giving him the right
> diet.  He has no other complaints.
>
> Emergency Department Course
>
> After evaluation I went ahead and obtained Hep-Lock.
> Lab work was drawn.  CBC, metabolic panel were within
> normal limits.  Abdominal series showed nonspecific
> bowel gas pattern.  He was given Toradol, mag citrate,
> which he states [is] what he typically gets when this

-6-

happens.  We will go ahead and discharge him back to the prison where he [] follow up with Dr. Gujral and modify his diet and return if his symptoms worsen.

Page ID #862

On July 7, 2009, Mr. Hendricks was seen over GI Telemed by Dr. Levine to discuss treatment and follow-up care for Crohn's disease.  PAGEID #868.  Dr. Levine's impression and treatment plan are reflected in a letter addressed to Dr. Akusoba of the Corrections Medical Center.  Id.

Impression: 1. Crohn's colitis status post total colectomy diagnosed in 2002.  There is no family history of colon cancer.  He does not [] a rectum still left in situ and he has an ileostomy.  His endoscopies from October 2008 were reviewed.  He does have some rectal inflammation.  I had referred him for a DEXA scan.  This was not done.  I referred him for evaluation with colorectal surgery but this was not done.  He had talked with his gastroenterologist and colorectal surgeon who had seen him prior to him coming to prison and they did not recommend removing his rectum.  We stopped his Remicade and he has had no real change in his symptoms.  He is really doing pretty well.  No abdominal pain, no nausea, no vomiting.  Weight loss.  His weight is down 8 pounds from November.  No fever, no chills.  He does not smoke.  He does complain of the fact that he has not been able to be placed on a low residue diet.  2.  History of seizures.

Plan: 1. DEXA scans.
2.  Low-residue diet.
3.  Follow-up with me in Telemedicine six months' time.
4.  Yearly flex sig for surveillance purposes.
5.  Folic acid 1 mg per day for chemo prophylaxis.

Id.

On July 29, 2009, Mr. Hendricks underwent DEXA scanning at OSU.  Page ID #869.  One of the indications for testing was Crohn's disease.  Id.

On October 10, 2009, Mr. Hedricks was admitted to the East Ohio Regional Hospital.  PAGEID #871.  He was discharged on

-7-

October 14, 2009 with a discharge diagnosis of Stevens-Johnson syndrome, secondary to Dilantin allergy; absence epilepsy, controlled; history of Crohn's disease, status post partial colon resection and status post ileostomy; hypokalemia; and allergic pneumonia, secondary to medication. Id.

On November 2, 2009, Mr. Hendricks was seen at the East Ohio Regional Hospital Emergency Room for "bleeding from ostomy, abdominal pain." PAGEID #872. According to the emergency trauma record, the treating physician's findings included:

> Ed Course
>
> The patient states he has changed his ostomy bag once had the same amount of blood earlier today. The patient did have a heparin lock established. I was concerned about anemia secondary to blood loss. CBC showed a white count of 10.4, H&H 13.7 and 41.2, platelet count was 309.000. Basic metabolic panel showed a potassium of 3.3, direct bilirubin less than 0.1. The remainder was normal. He had a serum sedimentation rate performed which was normal at 7. I discussed this case with Dr. Chacko who is the gastroenterologist on-call at OSU. He did accept this patient in transfer. I have spoken with Dr. Gujral prior to this and he approved the transfer of the patient to OSU. The patient has been cared for at OSU in the past for this, was hospitalized for a week for the same problem. He was transferred via ambulance to OSU for further workup and management. He had had an abdominal CT with oral contrast and this had shown thickening of the walls of the small bowel proximal loops consistent with enteritis. I believe the patient is suffering with an exacerbation of his Crohn (sic) disease. He was transferred to OSU in stable condition.

Id.

According to the discharge instructions from OSU, Mr Hendricks was admitted on November 3, 2009 and discharged on November 22, 2009. PAGEID #876-878. The reason for hospitalization is stated as:

> admitted with [] and pain. Found to have perastomal hernia. repaired. postop with pain, possible

-8-

> infected hematoma. drained.  wound to heal by secondary
> intention.  TID wet to dry dressings. Invanz to
> continue through 11.25.  Tolerating diet at d/c.  Also
> found to have diversion colitis.  Gi recommends BID
> short chain fatty acid enemas x 6 weeks.

The discharge instructions indicate a diagnosis of Crohn's flare
and a recommended regular/lo residue diet.  PAGEID ##876-877.  In
late November, 2009, Mr. Hendricks was transferred from Belmont
to the Frazier Health Center at Pickaway Correctional
Institution.  Hendricks' Declaration, ¶38.

Medical records for the relevant time period provided by the
defendants in support of their motion for summary judgment reveal
the following.  Interdisciplinary progress notes dated February
20, 2009 state as follows:

> Met with patient to review diet orders.  He
> discussed what he could not eat and his food
> preferences.  He stated that OSU had him on a low
> residue diet.  I located his discharge instructions
> from OSU and found:  Regular low residue listed as his
> diet.  I shared this information with the dietician and
> asked which of our diet plans fits this criteria.
> Informed patient I would have him seen on Wednesday by
> diet technician.  SNesbittHCA.

> Further, notes dated March 26, 2009 state:

> Arrived in IHS to sign releases of information.  Asked
> if he wanted to keep appointment with diet technician.
> He reports "I had passes for SAMI and medical at same
> time."  Informed him I would get him rescheduled with
> diet tech.  He asked to be seen by NP re: wound care.
> Informed him he would be scheduled.  Has appointment
> with Dr. Gujral to review seizure medication.  SNesbitt
> HCA.

Motion for Summary Judgment, Exhibit G

Infirmary admission orders dated April 23, 2009, indicate
that Mr. Hendricks had a "low residue diet order."  Motion for
Summary Judgment Exhibit I.  Further, orders dated May 22, 2009
indicate that Mr. Hendricks was to have six small meals a day for
six months and be weighed monthly.  Id. at Exhibit K.

-9-

Defendants' Exhibit M is a page of interdisciplinary progress notes containing an incomplete date (--/29/09 which defendants appear to interpret as December 12, 2009, see Roush Affidavit Exhibit P ¶9) which states:

> When diet cards were passed for inmate to pick up this inmate refused the diet card and stated to corr. officer "when the pass is yellow, then I will accept it.  See diet pass attached to note.

The signature following this entry is illegible.  This page also contains a photocopy of a diet pass issued to Mr. Hendricks. The pass identifies Mr. Hendricks' diet as "six small meals" with special instructions indicating an allergy to peanut butter, and that he is not to have "wheat bread, corn, raw veg or fruit." The pass notes an expiration date of November 17, 2009 and states that it "[e]xpires 180 days from issue date."

Defendants also have submitted declarations from Ms. Nesbitt and Mary Roush, the Acting Operations Manager at the Pickaway Correctional Institution where Mr. Hendricks is currently housed. According to these declarations, while correctional institutions can provide meal plans to address an inmate's specific dietary needs, the inmates are entitled to refuse these plans and purchase food items from the institution's commissary.  Mr. Hendricks' commissary records for the relevant time period indicate purchases of coffee, ramen noodles, Snickers, popcorn, cookies, hot sauce, soft drinks, and macaroni and cheese.  Motion for Summary Judgment, Exhibits L and P.

Defendants also have submitted several of Mr. Hendricks' medical records from 2007 and 2008.  Some of these records indicate a history of Crohn's disease but at least one of these records suggests no evidence of Crohn's disease.  See Motion for Summary Judgment Exhibits A-D.  Mr. Hendricks has submitted several medical records dating from 2002-2008.  See PAGEID ##825-

-10-

854.  These records indicate a diagnosis of ulcerative colitis in 2002 followed by the removal of his colon.  Records from 2003 indicate symptoms consistent with Crohn's disease.  A Corrections Medical Center discharge summary dated October 23, 2008, indicates that Mr. Hendricks experienced a "Crohn's Exacerbation."  PAGEID #854.  Discharge instructions from OSU Medical Center indicate that Mr. Hendricks was hospitalized from October 11, 2008 to October 22, 2008, for a "Crohn's exacerbation."  PAGEID #850.

The Ohio Department of Rehabilitation and Correction Bureau of Medical Services utilizes a diet formulary protocol the purpose of which "is to establish standardized guidelines, language, ordering procedures, and to specify the approved types of diets when ordering of therapeutic diets and liquid supplements for patients requiring nutrition intervention to treat medical conditions."  See Defendants' Reply, Attachment 1 (intended as Exhibit LL to Plaintiff's Response).  This protocol recognizes several therapeutic diets but does not specifically recognize a "low residue" diet.  Id. at pp. 3-6.  The version of the protocol provided here has a revision date of February 19, 2009 and an effective date of March 3, 2009. Id. at p. 1.

The protocol addresses requests for non-formulary diets as follows:

C.  Non-Formulary Diets

    1.  A nurse of ALP will refer all non-formulary diet orders to the nutrition services person for review.

    2.  Non-formulary diet orders from non-DRC facilities are considered to be recommendations and shall be reviewed by the DRC Dietary Operations Manager and the DRC Medical Director prior to implementation.

    3.  The dietitic technician shall contact the Dietary Operations Manager in writing listing the

-11-

patient name, number, Diet Order (DRC5002) and reason
documented for diet order.

    4.   The Dietary Operations Manager is responsible
for reviewing the written request and working with the
nutrition service person and the ALP to provide diet
alternatives that can be produced in DRC and that meet
the medical needs of the patient.

Defendants' Reply, Attachment 1, pp. 6-7.

There is no dispute that Mr. Hendricks was provided with a
"six meals diet" while housed at Belmont.  Hendricks'
Declaration, ¶42.  Under the diet formulary protocol, this diet
is described as follows

    ii.  Six Meals Diet

    1)   The diet provides the 3 meals and 3 snacks
        each day to provide adequate calories for
        patients who need to consume small amounts of
        food more frequently.

    2)   The morning and afternoon snack shall consist
        of 1 slice of bread, 2 ounces of cheese, 1
        piece of fresh fruit or ½ cup of canned fruit
        and 1 cup of beverage.

    3)   The evening snack shall be the same as a
        regular HS snack (see the HS snack section,
        2-b-vii, of this protocol).

The HS Snack is described in the protocol as follows:

    1)   HS snacks maintain consistent carbohydrate
        and protein levels throughout the night for
        insulin-dependent diabetics and provide
        additional calories for patients who have
        difficulty maintaining adequate weight.  HS
        snacks shall be composed of:

    a)   1 serving of starch – either 4 graham
        crackers or 6 saltine crackers, or 1 slice of
        bread.

    b)   1 piece of fresh fruit or 1/2 cup of canned
        fruit, and

c) 2 tablespoons of peanut butter for a regular
HS snack or 2 tablespoons of jelly for a low
protein/RENAL snack.

Defendant's Reply, Attachment 1, pp. 5 and 6.  Mr. Hendricks was
unable to consume some of the food in the snack bags.  Hendricks
Declaration, ¶45.

### B.  First Amendment Claim

With respect to Mr. Hendricks' First Amendment claim, the
verified amended complaint alleges:

(29) During plaintiff's stay at Belmont
Correctional Institution, he made several complaints
about his health and medical care.

(30) Plaintiff had been in contact with the Ohio
Justice & Policy Center; Americans Civil Liberties
Union; Crohn's & Colitis Foundation of America; private
attorneys and physicians.

(31) On June 10, 2009, defendant Miller ordered,
and was present at the time, the seizure and
destruction of most of this material causing a delay in
filing this complaint.

From his declaration, it appears that Mr. Hendricks
intended to submit affidavits from two witnesses, a copy of his
notification of grievance form, and the decision of the chief
inspector.  Hendricks Declaration, ¶¶46, 47.  These documents
were not attached to his declaration as filed.  Defendants have
submitted these documents in connection with their reply as
Attachment 2.  According to the affidavits, two inmates observed
a corrections officer search and remove papers from Mr.
Hendricks' legal box and then tear up these papers and throw them
away.  Defendants' Reply, Attachment 2, pp. 3-4.  Both
affidavits also indicate that Warden Miller was "sitting on the
desk."  Id.  According to the notification of grievance filed by
Mr. Hendricks on June 10, 2009, a correction officer searched his
legal box and "confiscated material/evidence crucial important

-13-

for a civil litigation against BECI." Id. at p.1. Further,
according to this grievance, "Warden Michele Miller ordered that
this evidence be destroyed and disposed of." Id. The decision
of the chief inspector indicates a belief that the grievance was
directed to Warden Eberlin, denies it for failure to allege
Warden Eberlin's personal involvement, and states that, to the
extent Mr. Hendricks is complaining about the actions of the
corrections officer, he failed to properly pursue the inmate
grievance procedure. Id. at p.2.

III.  Motion for Summary Judgment

In their motion for summary judgment, defendants argue that
Mr. Hendricks has failed to demonstrate their deliberate
indifference to his serious medical need. Further, they contend
that Mr. Hendricks' has failed to exhaust his administrative
remedies relating to his retaliation claim against Warden Miller,
and that they are entitled to qualified immunity. They also
contend that Mr. Hendricks' Eighth Amendment claim is barred by
the statute of limitations because, as they interpret his
allegations relating to this claim, December 24, 2010 was the
latest date by which he could have filed his complaint.

With respect to Mr. Hendricks' Eighth Amendment claim, the
defendants argue that there is no evidence in the file supporting
his claim that he has been diagnosed with Crohn's disease.
Regardless, however, they assert that Mr. Hendricks'
institutional records demonstrate that he has received
appropriate dietary accommodations. Defendants contend that any
continued distress Mr. Hendricks has suffered is a result of his
refusal to accept his diet passes and his commissary purchases of
spicy, seeded, or sugary foods and cigarettes, all of which are
items contraindicated for his digestive issues.

In response, Mr. Hendricks takes issue with the defendants'
assertion that he has not been diagnosed with Crohn's disease and

-14-

devotes pages of his brief and his exhibits (as detailed above) to establishing in excruciating detail the existence of this and numerous other gastrointestinal conditions.  However, in one paragraph found on page 16 of his 25-page response, he describes the nature of his Eighth Amendment claim as follows:

> In this case, Plaintiff has offered evidence that he endured pain and suffering while being denied the prescribed low residue diet, notwithstanding the absence of a tangible residual injury.  The record reflects that Plaintiff experienced severe pain, bleeding, anemia, hypokalemia, and ultimately a parastomal hernia resulting in surgical repair.  Moreover, Plaintiff suffered this pain while being denied a prescribed diet that would help to alleviate these very problems which Defendants' motion concedes was prescribed on several occasions, however, they offer no proof that it was followed or as to why this was denied, other than the Declaration from Defendant Nesbitt - one of the defendants directly involved in the denial.

See Response, p. 16.

Further, Mr. Hendricks states on pages 17-18,

> In the case at bar, Defendants concede and acknowledge the prescribed and needed low residue diet, however they do not explain why this was interfered with and/or denied by the Defendants.  All Defendants have done is point out that the low residue diet was, in fact, **_needed_** and **_ordered_**.  They have not submitted any actual physical proof that this was actually followed through with other than the Declaration from Susan Nesbitt, one of the key defendants in this case, stating that it was.  Contrary to the Defendants assertion that Plaintiff was provided a low residue diet, the Defendants Declarations from Susan Nesbitt and Mary Rousch, taken in conjunction with Exhibits "S-W", supra, and "LL" infra, actually shows that Plaintiff was not provided with a low residue diet, rather, he was provided a six small meal diet.  This is not the same as a low residue diet.  Plaintiff submits a copy of the Defendant's own policy concerning "Diet Formulary" which outlines a "six small meal" diet.  It should be noted that nowhere in this policy does it even mention a low residue diet.  Even parts of this "six small meal" diet contained in the "snack bags"

-15-

were not consumable by Plaintiff.

With respect to the remaining issues raised by the motion for summary judgment, Mr. Hendricks argues that the defendants are not entitled to qualified immunity because they were under an obligation to provide medically prescribed or necessary diets under the stipulation in Fussell v. Wilkinson.  Further, he contends that, because his claim is limited to the time period between February 20, 2009 and November, 2009, it is not barred by the statute of limitations.  Additionally, he contends that he has exhausted his claim against Ms. Miller as evidenced by the grievance he filed and the disposition of that grievance issued by the chief inspector.  With respect to the merits of his retaliation claim, he contends that he has a "right to file non-frivolous grievances and legal filings about mistreatment," and Ms. Miller's destruction of his legal materials in retaliation for doing so violates his First Amendment rights.

In reply, the defendants recognize that the Diet Formulary Protocol does not specify a "low residue diet" and that, consistent with this protocol, no such specific diet is available at Belmont.  However, they contend Mr. Hendricks' records indicate that they "made every attempt" to provide a diet that met his needs.  They argue that Mr. Hendricks has failed to raise any genuine issue of material fact to the contrary.  Further, they contend that, after Ms. Nesbitt's offer in February, 2009, to schedule Mr. Hendricks for consultations with diet technicians, he did not complain to any Belmont healthcare staff about his diet.  Additionally, they suggest that Mr. Hendricks' commissary purchases indicate his failure to adhere to an appropriate diet plan and reject as nonsensical his explanation that he uses his commissary purchases to barter for food which he can tolerate.  Defendants continue to argue that Mr. Hendricks'

-16-

claims are barred by the statute of limitations, they are entitled to qualified immunity, and he has failed to exhaust his retaliation claim against Ms. Miller.

## IV. <u>Analysis</u>

Initially, the Court notes that because Mr. Hendricks has specifically limited his claims to include only the time period between February 20, 2009 and November, 2009, it will not consider the statute of limitations argument raised by defendants.  His complaint was filed within two years of those dates.

### A. <u>Eighth Amendment Claim</u>

To establish an Eighth Amendment violation, a prisoner must show that he or she has a serious medical condition and that the defendants displayed a deliberate indifference to his or her health.  <u>Estelle v. Gamble</u>, 429 U.S. 97 (1976); <u>Wilson v. Seiter</u>, 501 U.S. 294 (1991).  This formulation has both a subjective and an objective component.  Objectively, the medical condition at issue must be "serious" as opposed to "trivial," "minor," or "insubstantial."  Subjectively, the defendants accused of violating the Eighth Amendment must have acted with a state of mind that can accurately be described as "deliberate indifference."  Each of these components requires some elaboration.

It is not always easy to distinguish serious medical conditions from those that are not sufficiently substantial to implicate the Constitutional prohibition against cruel and unusual punishment, and the facts concerning the seriousness of an inmate's condition are frequently in dispute.  In evaluating such claims, courts have given weight to a variety of factors, including whether the condition is one that a doctor or other health care professional would find worthy of treatment, whether it significantly affects everyday activities, and whether it

-17-

causes (or, if left untreated, has the potential to cause) chronic and substantial pain.  See Chance v. Armstrong, 143 F.3d 688, 702-03 (2d Cir. 1998); see also Harrington v. Grayson, 811 F.Supp. 1221 (E.D. Mich. 1993)(focusing on the severity of the condition, the potential for harm if treatment is delayed, and whether such a delay actually caused additional harm).

Under some circumstances, expert testimony may be needed to establish the seriousness of a medical condition, particularly if the inmate's claim is founded upon an unreasonable delay in treatment.  See Napier v. Madison Co., Ky., 238 F.3d 739 (6th Cir. 2001).  In other cases, however, when the condition does not involve "minor maladies or non-obvious complaints of a serious need for medical care," but rather "an obvious need for medical care that laymen would readily discern as requiring prompt medical attention by competent health care providers," expert testimony is not essential to a finding that a serious medical condition is present.  Blackmore v. Kalamazoo County, 390 F.3d 890, 898 (6th Cir. 2004).

As to the subjective element, in Farmer v. Brennan, 511 U.S. 825, 839 (1994), the Court adopted "subjective recklessness as used in the criminal law" as the appropriate definition for deliberate indifference. It held that "a prison official cannot be held liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety. . . ." Id. at 837.  Officials must be aware of facts from which they could conclude that a substantial risk exists and must actually draw that conclusion.  Id.  Prison officials who know of a substantial risk to the health or safety of an inmate are free from liability if "they responded reasonably to the risk, even if the harm ultimately was not averted." Id. at 844.

Because an Eighth Amendment medical claim must be

-18-

premised on deliberate indifference, mere negligence by a prison doctor or prison official with respect to medical diagnosis or treatment is not actionable under 42 U.S.C. §1983. "[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner." Estelle v. Gamble, 429 U.S. 97, 106 (1976); see also Brooks v. Celeste, 39 F.3d 125 (6th Cir. 1994).

The Court will turn first to the objective component of this claim - the existence of a serious medical condition. While the parties may disagree on the precise diagnosis of Mr. Hendricks' condition - whether ulcerative colitis or Crohn's disease - the fact that Mr. Hendricks' suffered from a serious medical condition is not at issue here. Nor could it be given the extensive, history of Mr. Hendricks' medical care demonstrated by the parties' exhibits and set forth at length above. Rather, the focus of defendants' motion for summary judgment is the subjective component of an Eighth Amendment claim - whether they acted with deliberate indifference in the face of Mr. Hendricks' serious medical condition. Mr. Hendricks argues that because the defendants did not provide what he considers to be a "low residue diet" as ordered by various doctors outside Belmont, they have acted with deliberate indifference resulting in his documented pain and suffering. To the contrary, the defendants argue that, although a "low residue diet" is not a diet specified under the ODRC's Diet Formulary Protocol, they made every attempt to accommodate Mr. Hendricks' dietary needs. The Court agrees with the defendants.

While the denial of a medically necessary diet may give rise to deliberate indifference under certain circumstances, see

-19-

Sellers v. Henman, 41 F.3d 1100 (7th Cir. 1994), Mr. Hendricks has presented no such circumstances here.  Further, while "a prisoner who suffers pain needlessly when relief is available" may be able to demonstrate deliberate indifference, see Gorley v. Sullivan County Jail Medical Dept., 2012 WL 1565416 (E.D. Tenn. April 30, 2012), Mr. Hendricks has not done so here.  Mr. Hendricks admits that he met with dietary staff at Belmont and that dietary accommodations were made for him during his incarceration at Belmont.  Further, he does not dispute that he was issued at least one diet pass stating that he should not be given peanut butter, wheat bread, corn, raw vegetables or fruit and that he refused this diet pass.

Additionally, Mr. Hendricks provides no evidence of what he considers to constitute a "low residue" diet nor does he explain how the diet he received and a "low residue" diet differ.  He has attached to his declaration a three-page document detailing nutrition therapy for Crohn's disease and ulcerative colitis with various notations directed to him, although there is nothing indicating from whom he received this information.  To the extent that the Court may consider such information, it does not set forth any specific "low residue" diet.  Rather, it contains lists of recommended and non-recommended foods and appears consistent with various dietary accommodations provided to Mr. Hendricks.

Mr. Hendricks offers nothing to rebut the defendants' contention that they attempted to accommodate his diet within the confines of the ODRC's Diet Formulary Protocol.  His desire for a "low residue" diet rather than the six small meals diet provided for him constitutes nothing more than a disagreement with the treatment provided to him.  Differences in judgment, however, are insufficient to state a deliberate indifference claim.  Estelle, 429 U.S. at 105-106.  Similarly, to the extent Mr. Hendricks believes that he should have been prescribed nutritional

-20-

supplements, he fails to demonstrate deliberate indifference for this very same reason.

To the extent that Mr. Hendricks believes that his Crohn's flares and hernia surgery requiring hospitalization while he was incarcerated at Belmont are clear evidence of defendants' deliberate indifference, he is mistaken. It may be that, based on Mr. Hendricks' medical history, a reasonable trier of fact could conclude that the defendants were aware that he faced a substantial risk of additional harm in the way of flare-ups or other gastrointestinal complications.  However, as discussed above, under <u>Farmer</u>, knowledge alone is not sufficient to demonstrate deliberate indifference.  Rather, Mr. Hendricks must demonstrate that in the face of this knowledge, the defendants disregarded the risk of further gastrointestinal complications or failed to take reasonable measures to prevent them.  This he has failed to do.  Mr. Hendricks simply has provided no evidence from which a trier of fact could conclude that the defendants' response, in the form of diet accommodations, was unreasonable, let alone intentionally or recklessly calculated to cause him harm.  Absent any evidence of this sort, Mr. Hendricks has not raised a genuine issue of material fact on the issue of deliberate indifference sufficient to withstand the motion for summary judgment.  <u>See</u> <u>Farmer</u>, 511 U.S. 844.  Consequently, the Court will recommend that defendants' motion for summary judgment be granted as to Mr. Hendricks' Eighth Amendment claim.

## B.  <u>First Amendment Claim</u>

Turning to Mr. Hendricks'First Amendment claim against Ms. Miller, the Court notes first defendants' argument that he has not exhausted this claim.  Mr. Hendricks disputes this assertion and has provided copies of the grievance he filed against Ms. Miller and the disposition of that grievance from the chief inspector.  In light of this evidence, Mr. Hendricks may have raised a genuine issue of material fact on the issue of exhaustion.  However, because Mr. Hendricks' claim clearly fails

-21-

on its merits, the Court will not consider the issue of
exhaustion.  See Woodford v. Ngo, 548 U.S. 81, 101 (2006)(the
PLRA exhaustion requirement is not jurisdictional and district
courts may "dismiss plainly meritless claims without first
addressing what may be a much more complex question, namely,
whether the prisoner did in fact exhaust available administrative
remedies.")

     To the extent that Mr. Hendricks intends to set forth a
retaliation claim against Ms. Miller, there is no question that
retaliation for the exercise of constitutional rights is itself a
violation of the Constitution.  To state a retaliation claim, a
plaintiff must allege three elements: (1) that he or she was
engaged in protected conduct; (2) an adverse action was taken
against him or her that would deter a person of ordinary firmness
from continuing to engage in that conduct; and (3) the adverse
action was motivated at least in part by the plaintiff's
protected conduct.  Thaddeus-X v. Blatter, 175 F.3d 378, 394 (6th
Cir. 1999).  Retaliation claims must include a "chronology of
events from which retaliation may plausibly be inferred."  Ishaaq
v. Compton, 900 F.Supp. 935 (W.D. Tenn. 1995), quoting Cain v.
Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988).  The retaliatory
filing of a disciplinary charge or other negative actions strike
at the heart of an inmate's constitutional right to seek redress
of grievances, so the injury to this right inheres in the
retaliatory conduct itself.  Id.  "An inmate has an undisputed
First Amendment right to file grievances against prison officials
on his own behalf."  Herron v. Harrison, 203 F.3d 410, 415 (6th
Cir. 2000).

     Assuming Mr. Hendricks could satisfy the first two elements
of his retaliation claim, he fails to provide any facts
establishing a causal connection between the filing of grievances
and the alleged destruction of his legal materials at the

-22-

direction of Ms. Miller.  It is well recognized that retaliation
is easy to allege and that it can seldom be demonstrated by
direct evidence.  See Harbin-Bey v. Rutter, 420 F.3d 571, 580
(6th Cir. 2005); Murphy v. Lane, 833 F.2d 106, 108 (7th Cir.
1987). "[A]lleging merely the ultimate fact of retaliation is
insufficient." Murphy, 833 F.2d at 108. "[C]onclusory
allegations of retaliatory motive 'unsupported by material facts
will not be sufficient to state ... a claim under §1983.' "
Harbin-Bey, 420 F.3d at 580, quoting Gutierrez v. Lynch, 826 F.2d
1534, 1538-39 (6th Cir. 1987); see also Murray v. Unknown Evert,
84 F. App'x 553, 556 (6th Cir. 2003) (in complaints screened
pursuant to 28 U.S.C. § 1915A, "[c]onclusory allegations of
retaliatory motive with no concrete and relevant particulars fail
to raise a genuine issue of fact for trial") (internal quotations
omitted); Lewis v. Jarvie, 20 F. App'x 457, 459 (6th Cir. 2001)
("bare allegations of malice on the defendants' parts are not
enough to establish retaliation claims").  Mr. Hendricks makes no
allegations and provides no evidence from which a trier of fact
could conclude that Ms. Miller had any awareness of complaints he
had made or grievances he had filed such that this knowledge
motivated the alleged destruction of his legal materials.
Consequently, the Court will recommend that summary judgment be
granted as to Mr. Hendricks' retaliation claim.

     Finally, to the extent that Mr. Hendricks' First Amendment
claim is intended as a denial of access to the courts claim,
summary judgment also is appropriate.  In order to succeed on
such a claim, Mr. Hendricks must demonstrate actual prejudice to
underlying litigation.  See Rodgers v. Hawley, 14 Fed.Appx. 403,
409 (6th Cir. 2001), citing Lewis v. Casey, 518 U.S. 343 (1996).
In his verified amended complaint Mr. Hendricks alleges only a
delay in filing the complaint in this action.  Mr. Hendricks has
not been prejudiced in pursuing this litigation by any delay in

filing the complaint.  Consequently, the Court will recommend that the motion for summary judgment be granted as to any access to the courts claim.

V.  <u>Recommended Disposition</u>

For the reasons stated above, it is recommended that the defendants' motion for summary judgment (#101) be granted.

PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s).  A judge of this Court shall make a <u>de</u> <u>novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made.  Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions.  28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation <u>de</u> <u>novo</u>, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  <u>See Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>United States v. Walters</u>, 638 F.2d 947 (6th Cir.1981).


                                   <u>/s/ Terence P. Kemp</u>
                                   United States Magistrate Judge

-24-
